## PAULING v. PAULING.

Civ. No. 1428.

District Court, D. Minnesota, Fourth Division.

May 15, 1946.

Henry Mackall (of Stinchfield, Mackall, Crounse & Moore), of Minneapolis, Minn.,

and L. A. Stebbins (of Stebbins & Pierce), of Chicago, Ill., for plaintiff.

Charles F. Noonan (of Dorsey, Colman, Barker, Scott & Barber), of Minneapolis, Minn., for defendant.

NORDBYE, District Judge.

Plaintiff and defendant each seek a summary judgment in their favor. They rely upon the following undisputed facts: On May 13, 1932, the plaintiff, Ethel S. Pauling, and one John W. Pauling were divorced. Shortly thereafter, John W. Pauling married defendant, who was his wife when he died on January 12, 1945. According to the divorce decree which was obtained by plaintiff, Pauling was required to pay her alimony at the rate of $250 per month as long as she lived and did not remarry. He also was required to name her the irrevocable beneficiary in life insurance policies in the sum of $24,500. Certain allowances also were made for the care of their children whose custody was awarded to plaintiff. The decree for divorce also contained a finding by the court that Pauling had agreed with plaintiff to pay her each year one-fourth of all his yearly income in excess of $12,000. However, that finding was not included in the order and judgment for the alimony.

Pauling paid plaintiff the $250 per month promptly until his death. When the divorce decree became effective, he was carrying two $10,000 policies and one $4,500 policy of insurance which named plaintiff as the irrevocable beneficiary. But in 1933 or 1934 Pauling obtained the $4,500 policy from plaintiff upon the promise to substitute, for various reasons, a $5,000 policy in its place. When he died he had not obtained the $5,000 policy for plaintiff in spite of her requests and his assurances at various times. So when Pauling died, he in fact was carrying only $20,000 in insurance for plaintiff, and after his death plaintiff discovered that premiums in the amount of $571.92 had not been paid on the $20,000 of insurance, and this amount was deducted from the amount paid to her as beneficiary of those policies. Plaintiff also discovered after his death that Pauling's income had exceeded $12,000 during every year from 1936 until his death, although he had not paid her the one-fourth of that excess in addition to the $250 per month minimum alimony as agreed. The deficit amounted to $12,903.25.

Plaintiff now brings this action to recover from the defendant $51,858.42 as follows: (1) the $4,500 represented by the insurance deficit; (2) $571.92 for the unpaid insurance premiums; (3) $12,903.25 as one-fourth of Pauling's income in excess of $12,000 per year; (4) $33,883.25 as the present value, at five per cent interest, of the $250 per month claimed to be due her under the divorce decree as alimony for the remainder of her life. The latter figure is based upon her life expectancy of 16.28 years according to the Vital Statistics-Special Reports of the Department of Commerce Bureau of the Census, Washington, D. C., dated January 11, 1944.

When Pauling died, he owned in joint tenancy, not tenancy in common, with the defendant two bank accounts in the total amount of $2,700, war bonds with a present value of approximately $10,000, a car valued at $1,000, and certain stock certificates valued at $2,845. He also left life insurance (including certain benefits in a retirement plan and group insurance) directly to defendant, as beneficiary, in the total amount of $55,756.90.

Defendant contends that, because of this joint tenancy arrangement and insurance program, Pauling left no estate, and that plaintiff, as Pauling's creditor, can enforce her claims only against his estate. Defendant further contends that all the insurance money is exempt from plaintiff's claims by virtue of Mason's Minnesota Statutes of 1927, Sections 3387 and 3388, and that the property in joint tenancy with defendant never was a part of Pauling's estate. Plaintiff, however, contends that the lack of an estate and Pauling's failure to provide for his obligations to plaintiff is the result of a conspiracy between defendant and Pauling to effect fraudulent conveyances from Pauling to defendant in joint tenancy and payment of insurance premiums in fraud of plaintiff's rights.

The parties have entered into a so-called partially agreed statement of facts, but they recognize that the evidence presented by

the record which is now before the court is the only record which could be made on the trial of the issues. They agree that the court's determination of their respective motions for summary judgment will determine the case.

The parties appear to agree that plaintiff is a creditor of Pauling's estate and could collect at least some of her claim if an estate existed. But, at the outset, it seems clear that when a husband dies, the personal property he held in joint tenancy, as distinguished from tenancy in common, with his wife belongs to his wife, and not to the husband's estate if the joint tenancy was not created by a fraudulent conveyance. Irvine v. Helvering, 8 Cir., 1938, 99 F.2d 265. So unless the bank accounts, the war bonds, the automobile, and the stock certificates involved in this case were in joint tenancy between defendant and Pauling as a result of fraudulent conveyances, they are not a part of Pauling's estate and plaintiff cannot enforce her claim against them.

Likewise, it is the rule in Minnesota that life insurance which passes directly to the beneficiary cannot be subjected to the debts of the insured except to the extent of the premiums which were paid in fraud of creditors. For Section 3388 provides: "Exemption in favor of family—Change of beneficiary—Every policy made payable to, or for the benefit of, the wife of the insured, or after its issue assigned to or in trust for her, shall inure to her separate use and that of her children, subject to the provisions of § 3387. * * *"

Section 3387 provides: "Who entitled to proceeds of life policy—Whenever any insurance is effected in favor of another, the beneficiary shall be entitled to its proceeds against the creditors and representatives of the person effecting the same. All premiums paid for insurance in fraud of creditors, with interest thereon, shall inure to their benefit from the proceeds of the policy, if the company be specifically notified thereof in writing before payment."

So plaintiff cannot enforce her claim against the insurance of which defendant was beneficiary unless, or only to the extent which, the premiums paid on the in-

surance of which defendant was beneficiary were paid in fraud of plaintiff's rights as Pauling's creditor. The parties have stipulated that plaintiff has not waived any of her rights to recover the amount of the premiums paid in fraud of creditors, if that be sustained, by reason of her failure to notify the insurance company of her claim, as the statute provides.

Plaintiff refers to Section 9447 of Mason's Minnesota Statutes 1927 and contends that this statute controls here. It provides:

"Property exempt—No property hereinafter mentioned shall be liable to attachment, or sale on any final process, issued from any court.

\* \* \* \* \* \*

"14. All moneys received by, or payable to, a surviving wife or child from insurance upon the life of a deceased husband or father, not exceeding ten thousand dollars.

\* \* \* \* \* \*

"All articles exempted by this section shall be selected by the debtor, his agent, or legal representative. The exemptions provided for in subdivisions 6–18 hereof, shall extend only to debtors having an actual residence in the state. No property exempted hereby shall be exempt from attachment or execution in an action for the recovery of the purchase money of the same property."

But this statute pertains to the situation in which the creditors of the *beneficiary* seek to subject the insurance to the debts of the *beneficiary*. Plaintiff was the creditor of Pauling, the *insured*. Sections 3387 and 3388 govern the situation in which the *insured's* creditors seek to subject the insurance to the debts of the *insured*.

Although no Minnesota case appears to deal with this point specifically, analysis of the cases cited both by plaintiff and by defendant shows that the Minnesota Supreme Court has applied the statutes consistently in the manner noted. See Murphy v. Casey, 1921, 150 Minn. 107, 184 N.W. 783; Cook v. Prudential Insurance Co., 1931, 182 Minn. 496, 235 N.W. 9; Kassmir v. Prudential Insurance Co., 1934, 191 Minn., 340, at page 350, 254 N.W. 446, which ap-

plied Sections 3387 and 3388, and Ross v. Simser, 1935, 193 Minn. 407, 258 N.W. 582, which applied Section 9447(14). The latter case deals with Section 9447(14) because the wife (beneficiary) was a co-maker of the note with her husband (the insured) and therefore was a debtor.

The case, therefore, resolves itself into a determination of whether any of the joint tenancies were created, and any of the insurance premiums were paid, in fraud of plaintiff's rights as Pauling's creditor. At the outset, it may be stated that there is an utter absence of any showing that the defendant took part in any plan or scheme on the part of Pauling to defraud. Consideration of the record also fails to sustain a finding that Pauling made the conveyances and paid the insurance premiums in question in fraud of plaintiff's rights as his creditor.

Pauling was solvent at all times during his lifetime. None of the transactions herein rendered him insolvent. During the last three years of his life, he was earning over $21,000 per year and he held a responsible executive position with a large manufacturing concern in the City of Minneapolis. He was some eight years younger than plaintiff and was in apparent good health up to the time he was stricken by a heart attack. There is no showing which would indicate that he had been warned or had any knowledge of a heart ailment. The war bonds were apparently all purchased since 1940, except four $100 bonds issued in 1937. The stock in the Skuttles Manufacturing Company was purchased some years before his death. The insurance carried by Pauling consisted of five policies in one company totaling $35,000, subject to a loan of $1,850.13, and the balance of the insurance consisted of certain death benefits by reason of his inclusion in a retirement plan instituted by his employer, and two certificates of group life insurance carried by him and his employer. All of the cost of carrying the retirement plan and substantially all of the cost of the group insurance was borne by the employer. He maintained two bank accounts, both of which were joint accounts with his wife, held in joint tenancy with the right of survivorship, and upon which either he or his wife might draw by means of checks. One was a special account which he used for the payment of his income taxes and certain special contributions, and the other was a joint checking account. At the time of his death, there was approximately $1,900 in one account and about $800 in the other. The parties hereto have stipulated with regard to the bank accounts that "There was no special agreement between Mr. Pauling and his wife that these checking accounts should be held in joint tenancy but it was simply done as a matter of course."

As stated, the placing of the war bonds, the stock, and the bank accounts in joint tenancy and the payment of insurance premiums on the policies in which the defendant was a beneficiary did not render Pauling insolvent. At any time up to the date of his death, he would have been able to pay the arrears claimed to be due on his alimony, and of course could have been required to transfer insurance in the sum of $4,500 to the plaintiff so as to comply with the divorce decree. It is not contended that the property held in joint tenancy would thereby be out of reach of his creditors during his lifetime, at least to the extent of his contribution thereto, and he had, of course, contributed the entire fund from his earnings. It seems unsound, therefore, to spell out any intent to defraud his creditors by doing that which he did do when it is evident that no creditor was being deprived of any right to proceed against the property which was held in joint tenancy. It must be assumed that Pauling understood this, and it seems far fetched to contend that a man earning a salary of nearly $2,000 a month intended, by placing $10,000 of war bonds, some stock certificates, and $2,700 in cash in joint tenancy with his wife, to carry out thereby any scheme or plan to defraud his creditors. The simple answer is that the creditors would not be hampered or hindered or even delayed during his lifetime by any such transaction, and he had no reason to expect an early death. It is common knowledge that to avoid probate expense, and for convenience, many married people handle their personal and real property in this manner. There is nothing uncommon or sinister about such an arrangement, but rather, it is

a very common and usual method followed in many households. It is not made to appear that plaintiff was pressing Pauling for any claimed arrears in alimony, or that Pauling was apprehensive that she would do so. True, by reason of operation of law, Pauling at his death left no estate, but he had no way of knowing that he would pass away before the plaintiff. Moreover, he did not know but that plaintiff might at any time become informed as to his true earnings and press the agreement which he apparently had made to increase the alimony payments accordingly. Concededly, it is within the bounds of possibility that Pauling arranged to have all his property in joint tenancy so that, upon his death, if there should be any claims on the part of his former wife, there would be no assets with which to pay them. But, on the other hand, it is just as reasonable to find, on the record here, that he handled his property in joint tenancy in good faith and for a perfectly legitimate purpose, and never anticipated that he, as the younger person, would be the first to pass away. At the time of his death, he was 53 years of age and the plaintiff was 61 years. The contingency that he might predecease the plaintiff and the assumption that he intended, therefore, to defraud his former wife, if at the time of his death there were alimony arrears, which of course is based on another assumption, is not established from the factual showing herein. If it is urged that he understood that the decree required the payment of alimony to plaintiff as long as she lived and that therefore he intended to leave no estate in order to defeat plaintiff's alimony of $250 a month in the event claim was made therefor after his death, such an assumption is likewise purely speculative. There is no evidence that Pauling considered himself liable for alimony to plaintiff after his death, and while the decree does state that Pauling must pay plaintiff alimony as long as she lives, it does not state specifically that this liability continues even if Pauling died before plaintiff. Considered in light of the insurance provisions in the decree, which obviously were intended to provide for plaintiff in the event of Pauling's prior decease, it is at least reasonable to urge that it was not intended that alimony should continue after Pauling's death. The burden of proof herein rests on the plaintiff to establish fraud, and merely by claiming fraud, that burden has not been sustained.

■ Nor does the fact that Pauling maintained $35,000 of insurance, of which his wife was beneficiary, constitute any circumstance from which fraud can be spelled in the payment of the premiums thereon. The mere fact that a debtor procures insurance for his wife does not constitute a fraud upon his creditors, even if the debtor is insolvent, in absence of actual intent. Ross v. Minnesota Mutual Life Ins. Co., 154 Minn. 186, 191 N.W. 428, 31 A.L.R. 46. The amount of insurance carried by Pauling in favor of his wife was not unusual or immoderate in view of his earnings and the standard of living which presumably he and his wife maintained. It would be quite ordinary and customary for a solvent businessman with an average earning record over a nine-year period of nearly $18,000 a year to carry insurance in favor of his wife in the amount indicated herein. He had a responsibility to his wife which he had to regard and carrying for her benefit this amount of insurance does not constitute any unusual circumstance. She had lived with him as his wife for about 13 years and his consistent earnings over $12,000 a year appear to have come about since his marriage to her.

Plaintiff refers to Section 8478 of Mason's Minnesota Statutes 1927 and the cases which hold that no intent to defraud is necessary if a conveyance made without a fair consideration renders the conveyer insolvent. But manifestly that statute cannot aid plaintiff, for the very evident reason that the placing of these bonds and moneys and stock in joint tenancy and the payment of the insurance premiums did not render Pauling insolvent. Irvine v. Helvering, supra, which applies Minnesota law is contrary to the plaintiff's position that the conveyances were fraudulent because they rendered his estate insolvent. In the Irvine case, the estate of the taxpayer was rendered insolvent by his conveyances to his wife as a joint tenant. The Government contended that the con-

veyances were presumptively fraudulent because the estate was rendered insolvent. In holding that such a presumption did not exist and that no fraudulent conveyance resulted, the court held at page 269 of 99 F.2d: "Sections 8478 and 8481 of Mason's Minnesota Statutes 1927, are clearly inapplicable * * *." In interpreting Section 8478, the court confined it to the coverage of a debtor who became insolvent by reason of conveyance and transfers during his lifetime, not after his death. The court inquired only whether the transfers rendered the debtor insolvent during his lifetime or whether they were made with actual intent to defraud his creditors. That case is binding upon this Court. It does not seem distinguishable in regard to the application of the statute referred to.

It is fair to note in passing that plaintiff could have compelled Pauling to produce the $5,000 policy in substitution for the $4,500 one released to him or to restore the $4,500 policy at any time before his death if she had chosen to do so. His neglect in this regard took place over a period of approximately ten years. The act or conduct of Pauling in failing to restore the insurance may create suspicion that he purposely intended to deprive the plaintiff of this insurance. On the other hand, the long delay may have been mere neglect, and as long as his former wife did not unduly press the matter, the situation was never remedied. As far as the record indicates, the $4,500 policy he obtained from the plaintiff was not given to the defendant. And this incident of obtaining from the plaintiff the $4,500 policy is in no way connected with the placing of his property in joint tenancy. Certainly, the placing of his property in joint tenancy would in no way defeat plaintiff's right to have the $4,500 insurance restored to her. Whatever may be the explanation for his derelictions in this regard, it does not stamp Pauling's arrangement with the defendant as fraudulent. The same observation is pertinent regarding Pauling's failure to pay $571.92 as the balance due on the premiums in arrears on plaintiff's life insurance.

In conclusion, it may be reiterated that all of plaintiff's rights as to alimony arrearages and insurance benefits, which she now contends have been taken from her because of joint tenancy arrangements and insurance premiums paid during Pauling's life, could have been secured to her if she proceeded to do so during his lifetime. Broadly speaking, a solvent person can do with his property as he pleases in absence of an intent, either actual or constructive, to defraud his creditors. If there lurked in Pauling's mind an intent to defraud, in doing that which he did do with respect to his personal property and procuring insurance for the benefit of his wife, such intent has not been sufficiently established on the record herein. It follows, therefore, that defendant's motion for a summary judgment in her behalf must be granted. It is so ordered.

An exception is reserved to the plaintiff.